**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **IN RE: FAWWAZ F. BEYHA** | : | **Chapter 11** |
| | : | |
| **Debtor** | : | **Bky. No.  11-18010 ELF** |
| _____ | : | |
| | : | |
| **FAWWAZ F. BEYHA** | : | |
| | : | |
| **Plaintiff** | : | **Adv. No. 20-252** |
| | : | |
| **v.** | : | |
| | : | |
| **CONESTOGA TITLE INSURANCE COMPANY, et al.** | : | |
| | : | |
| **Defendants** | : | |
| | : | |

# M E M O R A N D U M

## I.    INTRODUCTION

"The consequences for missing deadlines can often be harsh."  Ben-Yisrayl v. Wilson, 2015 WL 5542525, at *5 (S.D. Ind. Sept. 18, 2015).  This is such a case.

The parties' dispute emanates from a loan transaction secured by a mortgage on real property that took place in 1997, fourteen (14) years before the Fawwaz F. Beyha ("the Debtor") commenced this chapter 11 bankruptcy case in 2011.  Conestoga Title Insurance Company ("Conestoga") is the current record mortgage holder.  The Debtor obtained confirmation of a chapter 11 plan.  The bankruptcy court entered a final decree in the chapter 11 case in 2016.

When Conestoga resumed efforts to enforce the mortgage against the Debtor's property after the conclusion of the Debtor's chapter 11 case, the Debtor returned to this court seeking relief from what he claims is a violation of his confirmed plan and his bankruptcy discharge.

The Debtor contends that his confirmed chapter 11 plan extinguished the 1997 mortgage now held by Conestoga and that Conestoga, which did not object to confirmation of the plan, is bound by its terms.

Presently before the court are the parties' cross motions for summary judgment.  (Adv. No. 20-252, Doc. #'s 11, 19).

For the reasons stated below, I conclude, based on the Debtor's confirmed plan, 11 U.S.C. §1141(c), and the Debtor's completion of the plan, that the subject property revested in the reorganized Debtor free and clear of the mortgage interest now claimed by Conestoga.  Based on the current record created by the parties at this summary judgment stage, it is not possible to determine the remedy to which the Debtor is entitled.[1]  Therefore, I will grant the Debtor's motion, deny Conestoga's motion, and schedule a further hearing in this adversary proceeding.

## II.  BACKGROUND

To understand the parties' dispute, it is necessary to review both the pre-bankruptcy history as well as the (tortuous) procedural history of the bankruptcy proceedings.  There are no material facts in dispute.

---

[1]    Thus, strictly speaking, the Debtor's motion is for partial summary judgment.  There is nothing in the record that permits the court to fashion an appropriate remedy for the asserted violation of the Debtor's rights.

Conestoga styled its motion as a "Motion Under Bankruptcy Rule 3001(e)(4) to Determine the Rights of Conestoga Title Insurance Company Regarding the Administration of Debtor's Estate."  However, in the context of this adversary proceeding, functionally, the motion serves as a motion for summary judgment.

## A. The Property and the Underlying Loan Transactions

Since 1997, the Debtor has owned the property located at 1900 South 19th Street, Philadelphia, PA ("the Property").

As of August 12, 1997, the Property was subject to a mortgage held by Springleaf Financial Services, Inc., f/k/a American General Finance ("Springleaf"), in the approximate amount of $33,000.00 - 35,0000.00 ("the Springleaf Mortgage" or "the Springleaf Loan").

On October 31, 2006, the Debtor entered into a loan transaction with Delta Funding Corporation ("Delta") in the amount of $135,450.00 ("the 2006 Loan"). The 2006 Loan was secured by a Mortgage on the Property ("the 2006 Mortgage"). Subsequently, Delta assigned the 2006 Loan and the 2006 Mortgage to HSBC Bank USA ("HSBC"). (Bky. No. 11-18010, Proof of Claim # 4-1). Ocwen Loan Servicing, LLC ("Ocwen") is the servicer for HSBC and filed its proof of claim. (Id.).

The Debtor contends that the 2006 Loan with Delta refinanced the Springleaf Loan, with Delta later assigning the mortgage to HSBC (and HSBC later assigning the mortgage, or at least the servicing rights, to Ocwen).[2]

---

[2]      The Debtor's confirmed plan asserts that Ocwen is the holder of this claim as well as numerous other claims. The proofs of claim on the Claims Register indicate that Ocwen is merely the mortgage servicer for various creditors. (See Bky. No. 11-18010, Proofs of Claim #s 4, 5, 8, 9, and 23). However, "Ocwen" appears to have been used interchangeably with the underlying creditors. (See id., Proof of Claim # 8-2 (listing "Ocwen" as another name the creditor used with the debtor)). In addition, numerous Claim Transfer Agreements were filed for some of these proofs of claim in 2013 and 2014 purporting to transfer the claims to Ocwen; however, it appears that the transfer effected change of servicer only.

For our purposes, I will refer to the holder of the mortgage originated by Delta as either "HSBC/Ocwen" or a "Ocwen."

Following a 2012 claim by Ocwen against Conestoga under the title insurance policy, the

Debtor alleges that Conestoga "satisfied" Springleaf's mortgage by check dated September 28,

2012. According to the Debtor, this should have caused Conestoga to record a satisfaction of the

Springleaf Mortgage. (Complaint ¶¶ 18-20, 27-31).

Conestoga disputes the Debtor's characterization regarding the title insurance.

Conestoga contends that the 2006 Loan was intended to be a first position mortgage on the

Property, that the title insurance was intended for Delta's protection and that, due to an error by

the title company, the loan proceeds were not used to pay off the Springleaf Loan, leaving the

Springleaf Mortgage in place in first position on the Property and putting Delta/HSBC/Ocwen in

second position.[3] (Answer to Complaint ¶¶ 59-60, 67).[4]

Conestoga's theory of the case explains why Conestoga, not Springleaf, contests the

Debtor's position that the Springleaf Mortgage has been extinguished. Conestoga insured the

title of Ocwen's predecessor's (Delta) in the 2006 Loan Transaction. To put its insured (Delta or

HSBC/Ocwen) in first lien position, Conestoga took an assignment of Springleaf's rights and

subordinated its position to HSBC/Ocwen.[5]

---

[3]       Conestoga also states that, on information and belief, Ocwen became the holder of the
2006 Loan and Mortgage. (Answer to Complaint ¶ 67). This is technically incorrect. See n.2, supra.

[4]       The Debtor argues that as part of this 2006 refinancing transaction, he purchased title
insurance from Conestoga, but this contention is not supported by the record.

[5]       The assignment and subordination agreement are attached as exhibits to Conestoga's
Answer to the Complaint. While the documents were not formally authenticated, on their face, they
appear to have been recorded in Philadelphia County Department of Records on November 27, 2012 and
January 17, 2013 respectively. Devine v. Nationstar Mortg. LLC, 2015 WL 6555424, at *6 n.15 (E.D.

## B.  The Bankruptcy Case

### 1.  the chapter 13 phase

On October 16, 2011, the Debtor commenced a chapter 13 bankruptcy case in this court.

In his bankruptcy schedules, filed on November 12, 2021, the Debtor listed ownership of

the Property, along with nine (9) other properties located in Philadelphia, PA.  In Schedule D, the

Debtor listed Springleaf as the holder of the first mortgage on the Property with a balance of

$35,000.00 and Ocwen as the holder of the second mortgage on the Property with a balance of

$85,200.00.  (Bky. No. 11-18010, Doc. # 17).  The Debtor did not list either debt as disputed.

In his chapter 13 plan, also filed on November 12, 2011, the Debtor proposed to pay off

Springleaf's claim at $35,000.00 and Ocwen's claim to the extent it was an allowed secured

claim under 11 U.S.C. §506(a).  (Debtor's Chapter 13 Plan ¶ 2) (Bky. No. 11-18010, Doc. # 19).

This reference to Ocwen and §506(a) implies that the Debtor perceived the Springleaf Mortgage

to be in first lien position and, based on the value of the Property, that Ocwen's secured claim

was undersecured.  See  n.6, infra.

On October 21, 2011, five (5) days after commencement of the bankruptcy case,

Benjamin E. Witmer ("Witmer"), of the law firm Fox & Fox, filed an entry of appearance and

request for notices on the docket on behalf of Springleaf.  (Bky. No. 11-10810, Doc. # 9).

---

Pa. Oct. 28, 2015) (allowing use of document that were not formally authenticated but that were court
filings/judgments, which were repeatedly submitted into the record and not objected to by a party).  The
Debtor has not questioned the documents' authenticity or the fact that the assignment and subordination
transactions occurred.  See Shiffer v. Liberty Mut. Fire Ins. Co., 2019 WL 3297513, at *1 (M.D. Pa. July
22, 2019) (in absence of objection unauthenticated exhibits considered by the court); Heselpoth v.
Cavileer, 2005 WL 1490978, at *4 n.2 (D.N.J. June 22, 2005) (same).  Consequently, I have considered
the assignment and subordination agreement.

On January 17, 2012, Springleaf filed a proof of claim, asserting a claim in the amount of

$36,733.34, secured by the Property.  (Bky. No. 11-10810, Claim No. 16).  The proof of claim

was signed by Megan White, bankruptcy specialist.  The proof of claim requested that notices in

the case be sent to Springleaf at 519 Baltimore Pike, Springfield, PA 19064-3811.

On January 18, 2012, the Debtor commenced an adversary proceeding against Ocwen,

seeking to bifurcate its secured claim into secured and unsecured components pursuant to 11

U.S.C. §506(a), but later agreed to dismiss the proceeding.[6]

On February 6, 2012, Springleaf, acting through Witmer, filed an objection to

confirmation of the Debtor's chapter 13 plan.  (Bky. No. 11-10810, Doc. # 69).

On February 25, 2012, Springleaf (again, through Witmer) filed a motion for relief from

the automatic stay on Springleaf's behalf.  (Id., Doc. # 94).  The motion was granted by order

dated March 12, 2012.  The order "lifted" the stay "as to Springleaf, its nominee or assignee."

(Id., Doc. # 112).[7]

---

[6]      In the adversary complaint against Ocwen, the Debtor also named Springleaf as a co-defendant.  (See Adv. No. 12-044).

In the complaint, the Debtor alleged that, due to the existence of Springleaf's $35,000.00 mortgage and the fair market value of the Property being only approximately $65,000.00, Ocwen's secured claim (based on its second mortgage) should be allowed only in the amount of $30,000.00 rather than approximately $115,000.00 as set forth in Ocwen's proof of claim.

It is unclear why the Debtor named Springleaf as a defendant in this adversary proceeding.  In any event, Springleaf was dismissed as a defendant on April 3, 2012 for lack of prosecution.  (Adv. No. 12-044, Doc. # 6).

By order entered July 11, 2012, the Debtor's claim against Ocwen was dismissed without prejudice by agreement.  (Id., Doc. # 11).

[7]      The Debtor filed a motion to reconsider the stay relief order.  That motion was denied by

## 2. the conversion to chapter 11

On May 23, 2012, approximately two (2) months after the entry of the order granting

Springleaf relief from the automatic stay, the court converted the chapter 13 case to chapter 11

on Debtor's motion. (Bky. No. 11-10810, Doc. # 158).

On May 26, 2012, the Debtor filed an Amended Schedule D, still listing Springleaf and

Ocwen as the holders of the first and second mortgages on the Property. Again, the filing gave

no indication that the claims were disputed.

On July 5, 2012, the Debtor filed a proposed chapter 11 plan of reorganization. (Id., Doc.

# 205). Thereafter, the Debtor filed a series of proposed amended plans, culminating in the

Eighth Modified Plan of Reorganization ("the Confirmed Plan"), filed on August 6, 2014 and

confirmed by the court on December 3, 2014. (Id., Doc. #'s 347, 410).[8]

On September 12, 2012, shortly after the Debtor filed his first proposed chapter 11 plan

and long before he filed the Confirmed Plan, Conestoga paid Springleaf, took an assignment of

Springleaf's rights and subordinated its lien position in favor of Ocwen. See n.5, supra. At the

time, Conestoga was aware of the existence of the bankruptcy case. In fact, Conestoga knew of

---

order entered May 3, 2012, which stated that Springleaf "is free to proceed with it's [sic] mortgage
foreclosure action with respect to the [P]roperty . . . on or after May 16, 2012." (Bky. No. 11-18010,
Doc. #'s 116, 137).

[8]     Other than the fact that a prior proposed plan was denied confirmation, I cannot explain
why it took more than two (2) years from the conversion of the case to chapter 11 for the Debtor to
propose a plan that obtained confirmation. Prior to confirmation of the Debtor's chapter 11 plan, another
bankruptcy judge (since retired) presided over the case. Upon that judge's retirement, the case was
reassigned to another bankruptcy judge on June 26, 2018. The second judge also subsequently retired.
The case was reassigned to the undersigned judge on June 26, 2020.

the existence of the bankruptcy case as of March 14, 2012.  (Conestoga Response to Request for

Admission No. 5) (Adv. No. 20-252, Doc. # 11-3).

### 3.  the Confirmed Plan

The following provisions of the Confirmed Plan are relevant in this adversary

proceeding.

In the definitional section of the Confirmed Plan, the Debtor defined Ocwen as, <u>inter alia</u>,

the original holder of the second mortgage on the Property but who "brought [sic] out the interest

of Springleaf; thus, it holds a first mortgage interest."  (Confirmed Plan §1.34).  The Debtor

defined Springleaf as the original "first mortgagee, for 1900 South 19th Street, which has sold its

claim to Ocwen and thus holds no claim against Debtor."  (<u>Id.</u> §1.43).

In §4.01 of the Confirmed Plan, the Debtor classified Class 3 claims as "secured claims"

that are impaired.  Section 4.01 further provides that class 3 claimants "will retain their liens,

**except the claims of** Lava Funding and **Springleaf**."  (<u>Id.</u> §4.01) (emphasis added).  Later, in

another hanging paragraph within §4.01, the Confirmed Plan states: "The claim of Springleaf has

been satisfied by Ocwen and no amount is owed to Springleaf."[9]

The disclosure statement that accompanied the Confirmed Plan does not mention

Springleaf. [10]  With regard to Ocwen, it states:

---

[9]       It is apparent that by the time the Debtor proposed the Confirmed Plan, his strategy for
treatment of the claims secured by the Property had changed.  Initially, he intended to pay off the
Springleaf mortgage debt and strip down the Ocwen debt.  In the Confirmed Plan, he proposed to treat
Springleaf as nonexistent and to provide for Ocwen's secured claim.

[10]      Conestoga suggests that the Debtor's depiction of the Springleaf Loan as having been

. . . Debtor shall satisfy the Class 3 claim of Ocwen, in the agreed upon amount of $115,232.18 plus a modified fixed interest rate of 5.0%, and adjusted by agreed upon escrow payments, shall be paid by monthly installments that come due the Petition Date through the Maturity Date of the underlying October 31, 2006 mortgage and note.

(Bky. No. 11-10810, Doc. # 348 at 11).

### 4. Springleaf's participation during the chapter 11 phase

As stated earlier, Springleaf participated actively in the case while it was in chapter 13. It filed a proof of claim.

After receiving relief from the automatic stay, Springleaf did not participate further in the bankruptcy case; it filed no motions or other documents.

However, all of the documents filed in the case and appearing on the docket continued to be served electronically on its counsel, Witmer, including, inter alia:

- the Confirmed Plan:

- the disclosure statement that accompanied the Confirmed Plan (id., Doc. #'s 348, 357);

- the court's order that approved the disclosure statement, set deadlines for voting and the filing of objections to confirmation and scheduled the confirmation hearing, (id., Doc. # 358); and

---

satisfied by the 2006 Loan smacks of fraud. Not only are the representations and treatment of Springleaf in the chapter 11 plan inconsistent with the Debtor's bankruptcy schedules and prior filed chapter 13 plans, according to Conestoga, the Debtor continued making payments on the Springleaf Loan through 2010 — years after he claims it was paid off. Further, on September 15, 2011, about one (1) month *before* the Debtor filed his bankruptcy case, Springleaf obtained a default judgment in a mortgage foreclosure action against the Debtor with respect to the Springleaf Mortgage. (Conestoga Response to Debtor's Mot. for Summ. J. at 6) (Adv. No. 21-252, Doc. # 13); (Conestoga Supp. Mem. Response to Debtor's Mot. for Summ. J. at 4) (Id., Doc. # 20). The Debtor has offered no convincing explanation for the inconsistencies in his treatment of the Springleaf Mortgage during his bankruptcy case.

- the confirmation order, (id., Doc. # 410).

**5. post-confirmation procedural history and the filing of this adversary proceeding**

On June 14, 2016, the court entered a final decree and closed the chapter 11 case. The

court did not enter a discharge order. See 11 U.S.C. §1141(d)(5) (confirmation order does not

discharge debts of individual debtor). Subsequently, on June 28, 2018, upon Debtor's motion,

the court reopened the case and granted the Debtor a discharge. (Id., Doc. # 473).

In July 2019, Conestoga initiated collection efforts on the Springleaf Loan.

On October 11, 2019, the Debtor filed another motion to reopen the closed bankruptcy

case. (Id., Doc. # 490). The Debtor requested that the court reopen the case to permit him to file

an adversary proceeding to enforce his bankruptcy discharge. Conestoga contested the motion to

reopen the bankruptcy case.

On March 4, 2020, the court granted the Debtor's motion. (Id., Doc. # 507).

On October 9, 2020, the Debtor commenced this adversary proceeding by filing a complaint

("the Complaint") [11] against Defendant Conestoga Title Insurance Company ("Conestoga") and

---

[11]    There is an explanation for the seven-month hiatus between the entry of the order
reopening the bankruptcy case and the filing of the Complaint.

Although the court's order reopening the case stated only that the motion to reopen was
granted, Conestoga filed a notice of appeal. Conestoga was concerned that the accompanying
memorandum appeared to have decided the merits of the parties' dispute, rather than simply reopening
the case. See In re Beyha, 2020 WL 1061213, at *4 (Bankr. E.D. Pa. Mar. 4, 2020) ("The upshot of all of
this is that Conestoga's lien was divested by the Debtor's Plan").

Then, after the case was reassigned to me, I had a colloquy with counsel. In the interest
of moving the matter to the merits, and by the parties' agreement, on October 7, 2020, I entered an order
vacating "as unnecessary" the March 4, 2020 order reopening the case. (See (Bky. No. 11-10810, Doc. #
539); see generally In re Kneer, 628 B.R. 205, 212 n.4 (Bankr. E.D. Pa. 2021) (citing cases questioning the

-10-

Andrew R. Vara, U.S. Trustee ("Vara").[12]

On November 2, 2020, Conestoga filed an answer to the Complaint and a counterclaim. In the counterclaim, Conestoga asserted that due to the Debtor's fraudulent actions and its lack of actual notice of the terms of the Confirmed Plan, as a matter of equity, the court should confirm the existence and validity of the Springleaf Mortgage.

This (finally) brings us back to the summary judgment motions.

### III.  THE PARTIES' CONTENTIONS

The issue presented is whether Conestoga is bound by the Confirmed Plan, which purported to extinguish the Springleaf Mortgage now held by Conestoga.

The Debtor's theory of the case is straightforward and linear.  He argues:

- The Confirmed Plan expressly stated that Springleaf would not retain its lien.

- By operation of law, see 11 U.S.C. §1141(c), the Property was "dealt with" in the Confirmed Plan and therefore, was free and clear of the Springleaf Mortgage.

- Springleaf was on notice of and participated in the bankruptcy case and the Confirmed Plan.

- Springleaf is bound by the Confirmed Plan by statute and Supreme Court case

---

need for a bankruptcy court to reopen a case before exercising its jurisdiction).  Conestoga withdrew its appeal of the order reopening the case, (see Bky. No. 11-10810, Doc. # 542) and the Debtor promptly filed the Complaint.

[12]    It is hard to understand why Debtor named Vara as a defendant.  The Complaint fails to state a claim against Vara.  It refers to no conduct of Vara and seeks no relief against him.  I will dismiss Vara as a party.  See Bethea v. Nation of Islam, 248 F. App'x 331, 333 (3d Cir. 2007) (citing Chute v. Walker, 281 F.3d 314, 319 (1st Cir. 2002)).

law, see 11 U.S.C. §1141(a); U.S. Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 272 (2010).

- Conestoga, too, is bound by the Confirmed Plan as Springleaf's successor in interest even though Conestoga was not served with the Confirmed Plan because the Debtor gave proper notice to Springleaf and Conestoga did not give the Debtor notice of its status as Springleaf's assignee, see Fed. R. Bankr. P. 3001(e)(2).[13]

In response, Conestoga makes three (3) main arguments, as follows:

1. Pointing to the lack of evidence that that the Springleaf Mortgage was paid off in the 2006 Loan transaction and the Debtor's acknowledgment of the existence of the debt in his proposed chapter 13 and initial chapter 11 plans, the Debtor's plan was fraudulent and should not be enforced by the court.[14]

---

[13]    Rule 3001(e)(2) provides:

> *Transfer of Claim Other Than for Security After Proof Filed*. If a claim other than one based on a publicly traded note, bond, or debenture has been transferred other than for security after the proof of claim has been filed, evidence of the transfer shall be filed by the transferee. The clerk shall immediately notify the alleged transferor by mail of the filing of the evidence of transfer and that objection thereto, if any, must be filed within 21 days of the mailing of the notice or within any additional time allowed by the court. If the alleged transferor files a timely objection and the court finds, after notice and a hearing, that the claim has been transferred other than for security, it shall enter an order substituting the transferee for the transferor. If a timely objection is not filed by the alleged transferor, the transferee shall be substituted for the transferor.

[14]    In a related argument, Conestoga asserts, based 11 U.S.C. §1141(d)(3)(C), that the Debtor's fraud precludes a determination that the mortgage was extinguished by the Confirmed Plan.

Section 1141(d)(3)(C) provides:

> The confirmation of a plan does not discharge a debtor if—
>                     .   .   .
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

This argument is plainly without merit.  It conflates the discharge of a debtor's personal liability with the extinguishment of an interest in property through the binding terms of a confirmed plan and the operation of 11 U.S.C. §1141(c).  It overlooks that the deadline for objecting to discharge under 11 U.S.C. §727(a) has long expired.  See Fed. R. Bankr. P. 4004(a) (in a chapter 11 case, the deadline for

2.  Conestoga is not bound by the Confirmed Plan because it was the mortgage
    holder when the Confirmed Plan was proposed and confirmed, but it had no
    notice of the confirmation process.

3.  The order granting Springleaf relief from the automatic stay removed the Property
    from the jurisdiction of the bankruptcy court, made it unnecessary for Springleaf
    (or Conestoga) to monitor or participate in the bankruptcy case and renders the
    Confirmed Plan unenforceable against Conestoga.

## IV. DISCUSSION

The starting point in analyzing this case is the Supreme Court's decision in U.S. Aid

Funds, Inc. v. Espinosa, 559 U.S. 260 (2010).

Espinosa makes clear that, provided that due process has been satisfied, a plan confirmed

by a final order not subject to modification on appeal is binding and is not subject to collateral

attack.  This legal principle applies even if the confirmed plan contains a provision that is

inconsistent with the Bankruptcy Code or provides relief that should have been obtained outside

the confirmation process (e.g., via adversary proceeding).  Thus, regardless of whether the

Springleaf Mortgage was truly avoidable by the confirmation process or whether its status was

more properly determined through another procedural mechanism, the Confirmed Plan that

provided for the Property to revest in the Debtor free and clear of the mortgage interest of

Springleaf/Conestoga is binding on Conestoga — provided that due process has been satisfied.[15]

---

filing a complaint objecting to the debtor's discharge is the first date set for the hearing on confirmation).
It also ignores the fact that the court's order of June 28, 2019 granted the Debtor a discharge and that
order remains in place.

[15]    There is a reported decision in this district that held that a confirmed plan that purported to avoid,
cancel, or reduce a creditor's judgment lien was "ineffective" because the plan provision was not the

Conestoga offers three (3) argument to avoid this outcome.

For the reasons explained below, I conclude that all three (3) of Conestoga's arguments miss the mark.

## A.  The Fraud Issue

Conestoga asserts that the court should not enforce the provisions of the Confirmed Plan due to the Debtor's fraudulent conduct.  Assuming, without deciding, Conestoga's premise that the Debtor committed fraud, Conestoga's initial argument is without merit and may be disposed of summarily.

The Bankruptcy Code expressly addresses the possibility that a chapter 11 confirmation order may have been procured by fraud.  Section 1144 provides, in pertinent part: "On request of a party in interest at any time before 180 days after the date of the entry of the order of confirmation, and after notice and a hearing, the court may revoke such order if and only if such order was procured by fraud."  11 U.S.C. §1144.

"The 180-day deadline for seeking revocation of an order of confirmation is absolute and may not be extended by the court."  Richard Levin & Henry J. Sommer, 8 Collier on Bankruptcy ¶ 1144.04 (16th ed. 2021) ("Collier"); see also In re Port Liberte Partners, 1995 WL 11186, at *4 (D.N.J. Jan. 5, 1995), aff'd sub nom. In re Port Liberte, 77 F.3d 463 (3d Cir. 1996) ("It is well-settled that a court may not issue an order revoking confirmation when

---

proper procedural vehicle for obtaining that relief and the debtor failed to invoke other, proper procedural mechanisms.  In re Geiger, 260 B.R. 83, 86 (Bankr. E.D. Pa. 2001), aff'd in part, rev'd in part and remanded, 2001 WL 34633702 (E.D. Pa. July 9, 2001), aff'd, 55 F. App'x 82 (3d Cir. 2003).  The Third Circuit's reported decision in In re Mansaray–Ruffin, 530 F.3d 230, 238–39 (3d Cir. 2008) is similar.  In light of Espinosa, these cases no longer appear to be good law.

revocation is sought more than 180 days after confirmation"). The strict statutory deadline is "reinforced" by Fed. R. Bankr. P. 9024, which provides that an action to revoke discharge must be filed within the time stated in 11 U.S.C. §1144, and Fed. R. Bankr. P. 9006(b), which prohibits the enlargement of time for taking action under Rule 9024. See Collier ¶ 1144.04.

The 180-day deadline applies even if the fraud is not discovered until after the expiration of the deadline. Collier ¶ 1144.04[2]; In re Midstate Mortg. Investors, Inc., 105 F. App'x 420, 423 (3d Cir. 2004) (nonprecedential); In re Olsen, 2008 WL 4298586, at *4 (S.D.N.Y. Sept. 19, 2008), aff'd, 357 F. App'x 369 (2d Cir. 2009) (citing In re 680 Fifth Ave. Assocs., 209 B.R. 314, 322 (Bankr. S.D.N.Y. 1997)).

The §1144 deadline is very short and can lead to harsh results. But, "[w]hile there is a strong bankruptcy policy against allowing a chapter 11 plan procured by fraud, there is an equally strong policy in favor of the finality of a confirmation order." Collier ¶ 1144.04[2].

Absent revocation, a confirmation order and the binding nature of a confirmed plan remain in force. See In re Longardner & Assocs., Inc., 855 F.2d 455, 460 (7th Cir. 1988) (section §1144 is the only avenue for revoking confirmation of a chapter 11 plan). It cannot be circumvented by appealing to the court's equity power. See In re Genesis Health Ventures, Inc., 340 B.R. 729, 733 (D. Del. 2006) ("While on its face, § 1144 appears to apply only to efforts to revoke a confirmation order, courts have adopted a wider approach, and have applied the bar in § 1144 when the complaint in question appears 'to do indirectly what [the plaintiffs] no longer may do directly' because of that statutory bar.") (alteration in original).

Consequently, Conestoga's initial argument — that the court should not enforce the provisions of the Confirmed Plan due to the Debtor's fraudulent conduct — fails.

-15-

**B.  The Lack of Notice Issue**

**1.**

Conestoga's next argument is that the Confirmed Plan is not enforceable because Conestoga lacked notice of the confirmation process.  Analysis of this argument best begins with the court's earlier opinion in the case, In re Beyha, 2020 WL 1061213 (Bankr. E.D. Pa. Mar. 4, 2020) ("Beyha I"), authored by a predecessor judges then presiding in this case.

Beyha I decided a contested matter in the main bankruptcy case.  The Debtor had filed a motion requesting that the court reopen the bankruptcy case so that he could raise the claims presently before the court.  Conestoga contested the motion on the ground that the Debtor was not entitled to relief requested.  See, e.g., In re Canoe Mfg. Co., Inc., 466 B.R. 251, 262 (Bankr. E.D. Pa. 2012) (among the factors the bankruptcy court considers in deciding whether to exercise its discretion to reopen a closed case is whether the movant would be entitled to relief if the case were reopened); In re Carberry, 186 B.R. 401, 402 (Bankr. E.D. Va. 1995) (a bankruptcy court "should not reopen a bankruptcy case where it appears that to do so would be futile and a waste of judicial resources").

In the procedural context of the motion to reopen, the parties raised many of the same issues that are presently before the court.  In order to grant the motion to reopen, the court did not have to decide the merits of the Debtor's claim, but had to conclude only that the Debtor's claims were not futile.  When the court then ruled in the Debtor's favor, Conestoga interpreted the court's opinion and order as having gone further — as having decided the merits of the parties' dispute — and appealed the court's order.  As explained earlier, see n.11, supra, I have vacated the court's prior order, which allowed for the dismissal of Conestoga's appeal, the filing

-16-

of this adversary proceeding and a new set of briefs by the parties.

To the extent that <u>Beyha I</u> may have decided issues prematurely, a ruling on those issues is now ripe.  Therefore, I consider it appropriate to review the reasoning in <u>Beyha I</u>.

**2.**

In <u>Beyha I</u>, the court read the Confirmed Plan as having expressly provided for the divestiture of the Springleaf Mortgage lien.  The Confirmed Plan proposed that only the Ocwen lien would be paid and that "[t]he liens of Springleaf (now Conestoga) and Lava would be extinguished and no payment would be received."  2020 WL 1061213, at *2.[16]

---

[16]    I agree with this description of the Confirmed Plan.  Section 4.01 expressly stated that Class 3 creditors (specifically, Capital Bank, JPMorgan, N.C.M., Ocwen, SunTrust, TD Bank, and Wells Fargo would retain their liens, "except the claims of Lava and of Springleaf."  However, this is a closer call than it appears on initial examination of the Confirmed Plan.

Section 1.34 of the Confirmed Plan defines  Ocwen, as "second mortgagee, for 1900 South 19th Street. Ocwen has brought out the interest of Springleaf; thus, it holds a first mortgage interest."

This definition is ambiguous and borders on the nonsensical.  One might read it to mean that Ocwen holds two mortgages and is both first and second mortgagee.  This interpretation finds some support in §1.43 of Confirmed Plan which defines Springleaf as having "sold its claim to Ocwen."

On the other hand, §1.34 (the definition of Ocwen), in referring to the "effect" of Ocwen's "buying out" Springleaf's interest states:  "thus" Ocwen "holds a first mortgage interest" without making any reference to a second mortgage.  This phrasing suggests that the Debtor probably meant, but failed to articulate, that Ocwen satisfied the Springleaf mortgage (by paying it off, rather than paying for an assignment of Springleaf's rights) and thereby achieved first position on its loan.

But there is another indication in the Confirmed Plan that expresses the Debtor's intent to take the Property free and clear of the Springleaf Mortgage.  Section 4.01 refers to Springleaf's claim as having been "satisfied" by Ocwen, not "sold."  Further, at no point in the case did Ocwen refer to itself as the holder of two (2) mortgages.  That is consistent with section 4.01, rather than the definitional sections.

The drafting of the Confirmed Plan is poor beyond belief.  Nevertheless, I find its intent clear:  Springleaf's mortgage was paid off, it holds no claim and the Debtor is taking the property free and

-17-

The court then considered the applicability of 11 U.S.C. §1141(c), which provides that,
subject to certain exceptions that were not applicable in this case, "after confirmation of a plan,
the property dealt with by the plan is free and clear of all claims and interests of creditors except
as otherwise provided in the plan."

The Beyha I court employed a four-part test for determining whether §1141(c) served to
extinguish a prepetition lien: (1) the plan must be confirmed; (2) the property that is subject to
the lien must be dealt with by the plan; (3) the lien holder must participate in the reorganization;
and (4) the plan must not preserve the lien.  2020 WL 1061213, at *3 (citing In re Omega
Optical, Inc., 476 B.R. 157, 164 (Bankr. E.D. Pa. 2012)).  The court determined that the only
prong of the test in question was whether the lien holder had participated in the bankruptcy case.
Id.

In considering the "participation" issue, the court addressed and rejected Conestoga's
argument that it had no notice of the Debtor's disclosure statement and plan and therefore, did
not participate in the case.  The court reasoned:

> A review of the Service List confirms Conestoga's contention that it did
> not received notice of these hearings.
> . . .
> This begs the question, however, of why Conestoga, an interested party,
> was not receiving notices while Springleaf, long since gone from the
> case, remained on the Clerks' Service List. Springleaf had assigned its interest in the
> 19th Street property 2 years before the Court approved the disclosure statement.
> Yet neither Springleaf nor Conestoga took any action to apprise the Debtor or the

---

clear of the Springleaf mortgage.

> Finally, Conestoga has not explicitly argued that the Confirmed Plan failed to provide for
> the Property to revest in the Debtor free and clear of the Springleaf Mortgage.  To the extent that
> argument was available, I consider it waived.

> Clerk's Office that Conestoga held the lien formerly held by Springleaf as to the
> 19th Street property.  . . . Conestoga never filed a Proof of Claim. Most
> importantly, Conestoga did not file a request for notices in the case as provided by
> L.B.R. 2002-1 until November 2019, almost 5 years after confirmation. So if
> Conestoga did not receive notice of the plan and disclosure statements, it was
> because it never informed the Debtor or the Bankruptcy Court Clerk's Office that
> it was a party in interest until it was too late. The fault for that lies squarely with
> Conestoga.

Id. at *4.

### 3.

Whether conceptualized as a "participation issue" under 11 U.S.C. §1141(c) or, more

generally, as a due process issue, with the issue now ripe and squarely before the court, I agree

with and adopt the above analysis from Beyha I.  The Debtor having provided ample notice to

the holder of the Springleaf Mortgage that participated in the case and Conestoga having failed

to provide the court and the Debtor with any notice that it, rather than Springleaf, should receive

notices in the bankruptcy case, I conclude that, for purposes of 11 U.S.C. §1144(c), Conestoga

participated sufficiently in the case to be bound by the Confirmed Plan and that there are no due

process concerns that require a different outcome.

It is hard to understand why Conestoga took no action to protect its interest in the

bankruptcy case.  As the title insurer, it was uniquely positioned to determine the state of the title

that it took when it adjusted Ocwen's title insurance claim and took an assignment of the

Springleaf Mortgage.  It is impossible to believe that Conestoga was not aware of the existence

of the bankruptcy case in which Springleaf, its predecessor-in-interest, had filed a proof of claim,

alleged the existence of a payment default and had actively participated and could not appreciate

the potential that the bankruptcy case could alter its rights as successor mortgagee.

The obvious consequence of Conestoga's failure to give the Debtor any notice of its status as Springleaf's successor is that it must be bound by confirmation process in which the Debtor gave Springleaf proper notice as required by the rules of court.  Accord In re Al-Saoudi, 2020 WL 443831, at *3 (Bankr. W.D. Mo. Jan. 27, 2020) ("the failure of a transferee to file a statement of transfer of claim carries the . . . risk that the transferee will not receive notice of other pleadings and motions filed in the case");[17] see generally In re Port Liberte Partners, 1995 WL 11186, at *4 (creditor bound by confirmed plan where he failed to provide the court with an updated address for service).

Conestoga suggests that the Debtor bore the burden to check the title of his property in connection with the confirmation process, arguing that, had he done so, he would have discovered Conestoga's status and could have served Conestoga with his disclosure statement and plan.  I disagree.

Nothing in the Bankruptcy Code or the rules of court compel a chapter 11 debtor to obtain periodic title reports in connection with plan confirmation.  Conestoga cites no authority for that novel proposition.  If anything, the rules of court suggest that it is the assignee's burden to give the court (and, by necessary consequence, the Debtor) notice when it takes an assignment of a claim.  See Fed. R. Bankr. P. 3001(e)(2).

For these reasons, Conestoga's "lack of notice" argument fails.

---

[17] The facts in Al-Soudi largely mirror the facts in this case with one (1) difference. In Al-Soudi, the creditor who took the assignment of the claim, but who did not file a notice of assignment or other action that would have put the creditor on the court's mailing list, notified the debtor of the assignment.  Even so, the court held that the creditor-transferee "bore the burden to file a notice of transfer."  2020 WL 443831, at *3.  In stark contrast, in this case, nothing in the record suggests that the Debtor was aware of the assignment from Springleaf to Conestoga.

### C.  The Order Granting Relief from the Automatic Stay

Conestoga has one (1) final arrow in its quiver, arguing that the March 21, 2012 order

granting Springleaf relief from the automatic stay removed the Property from the jurisdiction of

the bankruptcy court and authorized Springleaf to pursue all of its rights as mortgagee, including

foreclosure.  In so many words, Conestoga suggests that a stay relief order impliedly permits a

secured creditor to ignore all subsequent proceedings in the bankruptcy court, even those

proceedings that are directed specifically against the rights of the creditor.

I am not persuaded by this argument.

The order granting relief from the automatic stay did not oust the bankruptcy court's

jurisdiction over the Property in this case.  By its terms, a stay relief order under 11 U.S.C.

§362(d) does not address the court's jurisdiction.  It simply modifies certain restraints on creditor

action imposed by §362(a).  That general proposition holds true in this case, where the stay relief

order said nothing other than that the stay was "lifted."  As such, the order simply authorized

Springleaf, as the holder of a mortgage against the Debtor's Property, to take action that

otherwise was restrained by several, if not most, of the subsections of §362(a).

An important subsection of §362(a) from which Springleaf obtained relief was

§362(a)(4), which stays actions to enforce a lien against "property of the estate."  The

bankruptcy court has exclusive jurisdiction of property of the estate.  28 U.S.C. §1334(e)(1).  In

this case, property of the estate included the Property.  Thus, the stay relief order permitted

Springleaf to proceed against property of the bankruptcy estate.  To the extent the order

authorized foreclosure proceedings against the Property, the court relinquished its exclusive

jurisdiction over the Property.  But nothing in the order suggested that the court was

relinquishing its jurisdiction over the property in its entirety.

That said, even though the court retained jurisdiction over the Property, perhaps there are other reasons, presumably policy-based, why a creditor who obtains relief from the automatic stay to foreclose on real estate may properly consider the property's ties to the bankruptcy process severed and pay no further attention to the bankruptcy court proceedings that purport to affect the property.  At least one (1) court, In re Cline, 386 B.R. 344 (Bankr. N.D. Ala. 2008) takes that view.

In Cline, the automatic stay expired as to the debtor's residential mortgage lender, pursuant to 11 U.S.C. §362(c)(3).[18]  Notwithstanding the expiration of the automatic stay, the case proceeded and the debtor obtained confirmation of a plan that proposed to cure the mortgage lender's prepetition default.  Later, the debtor sought relief from the bankruptcy court to prevent the mortgage lender from pursuing a foreclosure action in state court, arguing that the confirmation of the plan overrode the court's order that determined that the automatic stay had expired.  In making this argument, the debtor relied on 11 U.S.C. §1327 (the chapter 13 analogue to 11 U.S.C. §1141).

The Cline court rejected the Debtor's argument, holding that §1327 "should not be construed as elevating plan confirmation to super-priority status, providing relief tantamount to

---

[18]      The Cline court treated the expiration of the automatic stay as the equivalent of a relief from stay order under §362(d).  That view of the effect of the expiration of the automatic stay under §362(c)(3) is probably the minority view.  Most courts view the expiration of the stay under that section as expiring as to the debtor, but not as to bankruptcy estate.  See, e.g., In re Williams, 346 B.R. 361, 367 (Bankr. E.D. Pa. 2006); see also In re Bender, 562 B.R. 578, 579 (Bankr. E.D.N.Y. 2016) (collecting cases).  For purposes of analyzing the effect of the stay relief order in this case, we can assume that the minority view is correct.

the automatic stay after bona fide stay protection was lost or never obtained . . . ." 386 B.R. at

352. The court reasoned:

> A plausible argument can be made that a creditor should monitor its debtor's case, and if a plan is proposed that does not recognize a pre-confirmation order denying an extension or imposition of the stay under Sections 362(c)(3) or (4), the creditor must oppose confirmation. This Court believes a stronger argument is that once a court finds there is no sufficient reason to justify an extension or imposition of the stay under Sections 362(c)(3) or (4), confirmation of a plan should neither change that finding nor interfere with the creditor's uninterrupted right to exercise its remedies post-confirmation without seeking additional relief from the court. By not monitoring the debtor's case, the creditor is not foolishly letting down its guard, rather it is justifiably relying on a prior and final order of the court. Additionally, if the door is left open for a debtor to replace his lost stay protection with similar relief upon confirmation, a creditor cannot commence exercising remedies and incurring associated expenses with any degree of confidence, knowing it may be stopped in midstream if the court refuses to recognize the post-petition efficacy of the stay relief.

Id. at 352-53 (footnote omitted).

Cline is decidedly a minority view[19] and I decline to follow its holding.

Respectfully, I disagree with the Cline court's view that once stay relief is obtained, a

creditor can simply ignore further proceedings in the bankruptcy court. Stay relief to pursue

foreclosure of property of the bankruptcy estate is not the same as dismissal of the case. It does

not relinquish the court's jurisdiction over estate property. It does not terminate the debtor's

bankruptcy rights in toto. A stay relief order modifies a statutory injunction against certain

creditor conduct; no more, no less. Once stay relief is granted, the creditor's actions may

---

[19]    See Lucontoni v. United Airlines, Inc., 446 F. Supp. 2d 4, 6 (D. Mass. 2006); In re Simpson, 240 B.R. 559, 562 (B.A.P. 8th Cir. 1999); In re Cottingham, 618 B.R. 555, 564–65 (Bankr. N.D. Ala. 2020) In re: Rodriguez, 2015 WL 9697324, at *7 (S.D. Fla. Dec. 9, 2015); In re Lemma, 394 B.R. 315, 323 (Bankr. E.D.N.Y. 2008); In re Moffitt, 2007 WL 1118287, at *3–4 (Bankr. N.D. Tex. Apr. 12, 2007); In re Fleming, 349 B.R. 444 (Bankr. D.S.C. 2006); In re Murphy, 346 B.R. 79, 82–83 (Bankr. S.D.N.Y. 2006); In re Kurtzahn, 342 B.R. 581 (Bankr. D. Minn. 2006); In re Sullivan, 321 B.R. 306, 308

increase the size its claim (e.g., through increased costs and expenses that it has the right to pass on to the debtor) and thereby imposing greater obligations on a debtor attempting to treat the claim in a chapter 11 or chapter 13 plan and possibly impacting negatively the feasibility of the plan proposed by the debtor.  Perhaps a debtor must address the stay relief order in the proposed plan.  But the stay relief order does not unconditionally terminate the debtor's right to propose a plan to treat the creditor's claim.  I see no textual support for that proposition in the Code.

Thus, despite the fact that Springleaf obtained relief from the automatic stay prior to confirmation, its successor, Conestoga, is bound by the Confirmed Plan.


## D.  Remedy

In the Complaint, the Debtor seeks various forms of relief, including a determination that Conestoga is in contempt of the discharge order, an injunction against further collection actions, an affirmative injunction requiring Conestoga to mark its mortgage satisfied, compensatory damages, punitive damages, and attorney's fees.

Through resolution of the cross-motions for summary judgment, I have determined that the Property did, in fact, revest in the Debtor, free and clear of the Springleaf/Conestoga mortgage interest.  But, the parties have not addressed the other types of relief requested by the Debtor.  Therefore, I will schedule further proceedings to determine whether the Debtor is entitled to any further relief and, if so, the scope of that relief.

---

(Bankr. M.D. Fla. 2005); Matter of Garrett, 185 B.R. 620, 623 (Bankr. N.D. Ala. 1995).

## V.  CONCLUSION

The outcome in this case is troubling.  From the evidence presented, it appears that the Debtor was not truly entitled to extinguish the Springleaf Mortgage and simply slipped an inappropriate provision into a proposed chapter 11 plan that escaped the notice of the affected creditor.  And, for whatever reason, the court did not exercise its authority to question the propriety of the plan provision before confirming the Debtor's plan.

Thus, the case is not a "poster child" for chapter 11 bankruptcy reorganization.  Quite the opposite.  It is the type of case that tends to put bankruptcy reorganization and the legal system generally, in a bad light.

As I stated at the outset, however, missing deadlines can lead to harsh results.  Conestoga undoubtedly is a sufficiently sophisticated party that could have intervened in the confirmation process to raise the issues it now belatedly seeks to raise.  But it did not.  Sleeping on one's rights has consequences.

The effect here is that the Confirmed Plan is binding on Conestoga and this court has no choice but to enforce its terms and the operation of 11 U.S.C. §1144(c), as unjust an outcome as that might be.  Therefore, I will grant the Debtor's motion for partial summary judgment and deny Conestoga's contrary motion.[20]

---

[20]    Conestoga's counterclaim essentially is the "flip-side" of the relief requested by the Debtor in this adversary proceeding.  Because I am granting the Debtor's motion for partial summary judgment, my order also will enter judgment in the Debtor's favor on Conestoga's counterclaim.

An order consistent with this Memorandum will be entered.

**Date:  March 10, 2022**

**ERIC L. FRANK**
**U.S. BANKRUPTCY JUDGE**